# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KEVIN THURMON, SR., ) <br> TIFFANY THURMON, ) <br> KEVIN THURMON, JR., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MOUNT CARMEL HIGH SCHOOL, ) <br> JOHN STIMLER, AND FRANK LENTI, ) <br> ) <br> Defendants. ) | Case No. 15 cv 4500 <br><br> Judge Robert M. Dow, Jr. <br> as Emergency Judge for <br> Judge Zagel |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' original [2] and amended [7] motions for a temporary restraining order (TRO). For the reasons set forth below, the Court respectfully denies both of Plaintiffs' motions [2, 7].

## I. Background[1]

Defendant Mount Carmel High School, a private school in Chicago, is conducting its graduation ceremony this Sunday, May 24, 2015. Of the approximately 140 students in the senior class, 130 are expected to participate in the ceremony. Plaintiff Kevin Thurmon, Jr., is among the 10 seniors not slated to graduate because, according to the school, he has not completed the academic requirements for graduation.

Thurmon has been classified as a student with a learning disability based on his attention deficit hyperactivity disorder ("ADHD") since his freshman year. Mount Carmel has provided

---

[1] The background section is taken from Plaintiffs' original [1] and first amended complaints [7], from the documents tendered and oral presentations given by counsel at the motion hearing on 5/22/2015, and from the motion [2] and amended motion [7] for temporary restraining order and Defendants' response [5] thereto. The Court notes that several documents are referenced in Plaintiffs' briefs as attachments, but many of those attachments are not accessible on the electronic docket. Counsel for Plaintiff may wish to review the docket and file a motion to supplement the record with the missing exhibits.

him certain accommodations based on his disability—for example, allowing him extra time to complete assignments and providing him with private exam rooms. Despite his disability, Thurmon played football for Mount Carmel for all four years of high school. Evidently Thurmon is an accomplished football player, as the amended complaint refers to scholarship offers that he has received from NCAA Division I schools.

The amended complaint contains a wide range of allegations of harassment by teachers and coaches that apparently stems from a dispute between Thurmon and Coach Lenti over Thurmon's workouts at non-school facilities and his attendance at certain football camps. These allegations involve inappropriate comments and threats of failing grades, as well as what Plaintiffs contend was a false charge of academic dishonesty leveled against Thurmon by a physics teacher. However, none of these allegations point to any action or inaction by Defendants prior to the eighth semester that could be seen as potentially derailing Thurmon's progress toward graduation.[2]

While the factual record is sparse at this early stage in the litigation, it appears that the events giving rise to this litigation began in earnest in early April 2015. Around that time, Thurmon and other Mount Carmel students were disciplined for defying adult authority following an incident that took place off campus while the students were supposed to be performing community service. On April 13, 2015, Principal John Stimler, a Defendant here,[3] wrote a letter to Thurmon's parents, informing them that their son would be required to complete the remainder of his senior year at home, albeit with the aid of Mr. Carmel tutors and Thurmon's

---

[2] There is an suggestion that Thurmon received an unwarranted failing grade on a final exam, but no allegation that the low mark on the final resulted in an overall failing grade for the class.

[3] The other individual Defendant, Frank Lenti, is Mount Carmel's head football coach.

counselor.[4] Under this arrangement, Thurmon was to submit all of his completed coursework by June 1, 2015. After he submitted the coursework, he would be allowed to take his final exams (the last prerequisite to graduation) and to graduate assuming he earned passing marks. Specifically, Stimler stated in his letter that "[o]nce the coursework is complete, the exam has been taken, and a passing mark has been earned in each of his 7 classes, Kevin will be awarded his diploma." He stated that, regardless, Thurman "is NOT permitted to attend any school functions and is not eligible to attend Prom *or Graduation*." (emphasis added). As of the date of this order, Thurmon has not completed his coursework or his final exams, thus failing to satisfy the graduation requirements.

Construing Plaintiffs' complaint liberally in light of documents and testimony produced during the TRO hearing on May 22, Plaintiffs appear to allege that (a) Defendants failed to accommodate Thurmon's disability and compromised his opportunity to complete his courses before graduation by requiring him to complete the remainder of his senior year at home, (b) Defendants' chosen form of discipline was racially based, (c) the severity of Thurmon's punishment violated the IDEA, and (d) that Defendants failed to take into account Thurmon's disability in allowing him to play football without restriction for all four years of high school. Plaintiffs argue that these failures to accommodate contributed to Thurmon's inability to complete the academic requirements for graduation. Plaintiffs also argue (e) that Mount Carmel—a private school that charges tuition—has breached its contract with Plaintiffs by refusing to allow Thurmon to participate in the graduation ceremony. Plaintiffs move for a TRO

---

[4] Principal Stimler's letter does not actually reference the community service incident; rather, it cites Thurmon's "repeated disregard and defiance of Mount Carmel's policies and personnel" as the reason for the home-schooling order. However, at the TRO hearing counsel for both sides appeared to agree that, at a minimum, the community service incident was the last straw for the school, and the timing of the letter—less than a week after the incident—corroborates that inference.

3

requesting, among other things, that the Court order Mount Carmel to allow Thurmon to participate in the graduation ceremony on 5/24/15.[5]

## II. Analysis

A party seeking a temporary restraining order must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets this burden, then the court must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.* The court then weighs all of these factors, "sitting as would a chancellor in equity." *Abbott*, 971 F.2d at 12. It applies a sliding scale approach, in which a party seeking a TRO or a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008).

Beginning with the likelihood of success on the merits, the IDEA "requires States receiving federal funding to make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 232 (2009) (citing 20 U.S.C. § 1412 (a)(1)(A)). A FAPE is "'specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the

---

[5] Because the TRO motion is before the Court in its capacity as Emergency Judge, the Court will address only those aspects of the relief sought that truly require an immediate decision—that is, the arguments relating to the graduation ceremonies on May 24. All other issues will be deferred for subsequent presentation to Judge Zagel, who is the assigned judge in this case.

4

child 'to benefit' from the instruction.'" *Jaccari J. v. Bd. of Educ. of City of Chi., Dist. No. 299*, 690 F. Supp. 2d 687, 696 (N.D. Ill. 2010) (quoting *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir.1994)). The IDEA aims to make a FAPE available to all children with disabilities by requiring that States accepting federal funds for the education of disabled children adhere to two statutory obligations, *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004), one procedural and one substantive, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 273–74 (7th Cir. 2007). To comply with the IDEA's procedural component, a school district must follow the "guaranteed procedural safeguards" set forth in the Act. 20 U.S.C. § 1415(a). To comply with the statute's substantive component, a school district must put in place an Individual Education Program ("IEP") that is "reasonably calculated to enable the child to receive educational benefits." *Murphysboro*, 41 F.3d at 1166 (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206-07 (1982)).

Courts therefore engage in a two-part inquiry to determine whether a school district has complied with the IDEA. *Rowley,* 458 U.S. at 206. First, a court considers whether the district has complied with the procedures set forth in the statute. *Id.* A district's failure to comply with the procedural requirements does "'not automatically require a finding of a denial of a [FAPE].'" *Ross,* 486 F.3d at 276. Procedural violations can be held to deny a student a FAPE only if they "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded Plaintiffs' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to Plaintiffs' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Second, a court asks whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 207. An IEP

5

is reasonably calculated to confer an educational benefit when it is "'likely to produce progress, not regression or trivial educational advancement.'" *Alex R.*, 375 F.3d at 615 (citation omitted). Once a school district has satisfied the procedural and substantive requirements of the IDEA, "the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Murphysboro*, 41 F.3d at 1166 (citation omitted).

Plaintiffs have presented a minimal likelihood of success on the merits, as they fail to state a claim under the IDEA. First, Plaintiffs make almost no factual allegations or legal arguments explaining how Mount Carmel violated the procedural requirements of the IDEA other than to allege in conclusory fashion, three days before graduation, that to the best of their knowledge Mount Carmel has never "conducted" an IEP or an ISP on behalf of Plaintiff. At the hearing, however, Defendants pointed out (without contradiction) that throughout his Mount Carmel career, Thurmon has received certain accommodations—extra time on tests and a quiet room in which to take them—on account of his disability (ADHD). Second, Plaintiffs fail to allege how the school's purported failure to develop an IEP caused the predicament that they contend is holding Thurmon back from graduating. They state that he was disciplined more severely than other students cited for similarly defying authority—a claim that appears to fall outside the scope of the IDEA—and they suggest that the home schooling arrangement fell below IEP standards, but they do not explain how or why the arrangement was deficient.[6] Plaintiffs also complain that leaving Thurmon on his own to complete assignments from home discriminated against Thurmon on the basis of his disability in violation of the IDEA as it

---

[6] To be sure, in their amended complaint, Plaintiffs allege that Defendant Stimler discouraged teachers from reaching out to Plaintiff when they knew or should have known of his disability. But Plaintiffs provide no factual basis for that allegation. Moreover, Stimler's April 13 letter made it clear that "[r]esponsibility for reaching out to teachers for work, assignments, study guides, and class materials rests SOLELY on [Thurmon]."

departed from the "environment contemplated by the Act." Defendants counter by noting that, if anything, the tutoring offered by the school to assist Thurmon in his home schooling provides more individualized attention than he could have received in the classroom. Defendants' view finds some support in one of the documents tendered by Plaintiffs' counsel at the hearing. That document, entitled "Recommendations for Kevin Thurmon," specifically states that "Kevin is likely to benefit from *structured, one-on-one instruction*" (emphasis in original). Ironically, the instructional regime contemplated by the "punishment" imposed in April of Thurmon's senior year may have come closer to the recommendations of the clinical psychologist and psychometrician who evaluated Thurmon than the classroom instruction he apparently had been receiving during the prior seven-plus semesters at Mount Carmel.

Finally, Plaintiffs do not explain how they are entitled to the remedy they request. The IDEA entitles Thurmon to procedural safeguards and an adequate IEP, but Plaintiffs do not explain how it entitles him to participate in a graduation ceremony if he has not completed the requirements to graduate.

Plaintiffs also fail to show any likelihood of success on their claim based on racial discrimination. They make a conclusory allegation that Mount Carmel discriminated against Thurmon on the basis of his race, but they provide no factual or legal basis for this claim; they do not explain what law Mount Carmel violated, how it discriminated against Thurmon, or how that discrimination led Thurmon to fail his graduation requirements. In the absence of almost any explanation, their allegations amount to threadbare conclusions and great leaps of causal logic. Moreover, they again fail to explain why this TRO is an appropriate remedy.

To the extent that Plaintiffs claim Thurmon received a different (and harsher) penalty than the other students involved in the community service incident, Defendants stated at the

7

hearing—without contradiction then or since by Plaintiffs—that the others (who, like Thurmon, are African-American) apologized for their role and showed contrition, while Thurmon did not. In other words, the school has come forward with the explanation that any difference in treatment is not the result of race, but rather of attitude. Whether Defendants have correctly judged Thurmon's attitude is not a question for this Court, but they have offered a non-race based reason for their decision that Plaintiffs have not countered.

Lastly, Plaintiffs have not shown any likelihood of success on their state law breach of contract claim either. As an initial matter, the Court would be unlikely to exercise supplemental jurisdiction over the contract claim if it dismissed the IDEA claim. But even if the Court exercised its supplemental jurisdiction, Plaintiffs do not allege the existence of a contract, let alone the nature of the terms, or how Defendants violated those terms. And even if the Court were to assume that Defendants' end of the bargain is to provide Thurmon a diploma, the information provided thus far in this case strongly suggests that Thurmon has not performed a condition precedent—namely, the successful completion of his course work and final exams.

Having found that, at best, Plaintiffs have a minimal likelihood of success on the merits of their claims, the Court need only briefly address the remaining TRO factors. The harm and hardship to Plaintiffs is real in this instance, as all parents and students hope and perhaps dream of attending the graduation ceremony that marks the end of the four year high school journey. Plaintiffs quite understandably are alarmed and disappointed at the prospect of Thurmon not marching in the graduation ceremony, as no doubt are the nine other families among the 140 seniors who are in the same boat. However, Mount Carmel also has a significant interest in upholding its disciplinary and academic standards and is within its rights to impose discipline on its students up to and including withholding the privilege of attending graduation. It also may

insist that all graduation requirements be met before conferring a diploma. Plaintiffs have not advanced any plausible, much less persuasive, rationale for using the IDEA to legally force Defendants to reverse course.

## III.    Conclusion

For the reasons stated above, the Court respectfully denies Plaintiffs' motions for a temporary restraining order [2, 7]. This ruling is limited solely to the issue of whether Plaintiffs are entitled to an order requiring Defendants to allow Plaintiff Kevin Thurmon, Jr. to attend and participate in the graduation ceremonies at Mount Carmel High School on May 24, 2015. If and when the parties wish to present any other issues for ruling, they should file an appropriate motion before Judge Zagel, the assigned judge in this case.

Dated: May 23, 2015

_____
United States District Judge

As Emergency Judge for Judge Zagel